[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This is a habeas matter in which the petitioner has brought a Two Count Petition. In Count One the petitioner claims that he was denied the effective assistance of counsel on the basis that his trial counsel failed to advise him that he had a right to CT Page 401 testify at a suppression hearing, failed to adequately investigate and make a determination as the petitioner's competence to stand trial, and failed to ensure that the petitioner had made a knowing and intelligent waiver of his right to testify at trial. In Count Two the petitioner claims that his conviction and resultant incarceration were illegally obtained in violation of various State and Federal constitutional rights on the basis that the court failed to suppress a statement given by the petitioner to the police. In his return, dated October 31, 1995, the respondent left the petitioner to his proof as to Count One. As to Count Two the respondent has alleged that the habeas court has neither the authority nor the jurisdiction to reverse a ruling by either the trial or the Supreme Court.
The court heard this matter on November 17, 1995. At the hearing several witnesses testified and exhibits were introduced including the transcript of the petitioner's criminal trial. Based on a review of the evidence and in light of applicable law, the court makes the following findings and order:
The petitioner was convicted after a jury trial of the crime of Murder and sentenced to a term of incarceration of sixty years. His conviction was upheld by the Supreme Court. cf. Statev. Damon, 214 Conn. 146 (1990). Prior to the trial, the petitioner's trial counsel filed a motion to suppress a statement the petitioner had given to detectives of the New Haven Police Department. The court denied the petitioner's motion following an evidentiary pre-trial suppression hearing at which the petitioner did not testify. The petitioner did not testify at trial either.
The petitioner is presently an incarcerated inmate under the care and control of the Commissioner of Corrections.
During the habeas hearing at which the petitioner did testify, he made factual assertions relating to the activities of detectives of the New Haven Police Department on the evening in question in support of his claim that his statement had been coerced, and had been obtained from him while in custody in violation of various Miranda rights. Members of the New Haven Police Department also testified at the habeas hearing. Factual assertions made by the detectives concerning their interactions with the petitioner, while consistent with one another, varied substantially from the version of events proffered by the petitioner. CT Page 402
By way of a brief summary of the underlying facts, on September 9, 1987 the body of Monica Joyner was discovered with multiple stab wounds in the basement of a three family dwelling located at 262 Dixwell Avenue in New Haven. The decedent lived on the second floor of the building with her husband and children. Also living in the building at the time was the petitioner's mother, Prisilla Damon, who occupied a first floor apartment. Although the petitioner did not live with his mother, he occasionally stayed at the Dixwell Avenue apartment. He was, in fact, in the building on the morning of September 9, 1987 before leaving for his employment at Bozzuto's Trucking Company in Cheshire. Bozzuto records revealed that the petitioner clocked in for work close to noon on September 9, 1987.
The victim's body was discovered by the building's owner at approximately 11:15 a.m., still warm, with her blouse pulled up over her breasts and her pants partially loosened.
While the New Haven police initially focussed their questioning on the person who found the body, they decided to interview the petitioner once Prisilla Damon had told them in the afternoon of September 9th that the petitioner had been in the building in the morning.
At approximately 8 p. m. that day, two New Haven detectives drove to Bozzuto's in Cheshire where they were met by two uninformed members of the Cheshire Police Department. They stopped at the main gate and asked to speak with the petitioner. Upon seeing the petitioner the detectives told him that they were investigating a homicide and asked him if he would accompany them to the New Haven Police Department to be interviewed. While at the time the detectives believed that there was an outstanding arrest warrant for the petitioner for an unrelated crime from either the Cheshire or North Haven Police Department, they did not inform the petitioner of this fact, and there was no evidence that the petitioner was aware that there was an outstanding warrant for his arrest
The petitioner agreed voluntarily to go to the New Haven Police Station with the detectives, and he traveled with them in an unmarked police car from Cheshire to New Haven. At the habeas hearing the petitioner testified that he had been locked into the car and seated in the back seat with one of the detectives while the car travelled at high rates of speed from Cheshire to New Haven. Both detectives, on the other hand, testified at the CT Page 403 hearing that the petitioner was alone in the back seat of the unmarked compact car, that there was no automatic locking system in the car, and that they had not locked the petitioner in the car. Each also testified that the car was driven at ordinary and reasonable speed. Having had the opportunity to observe and assess the credibility of each of the witnesses, the court credits the testimony of New Haven Police Lieutenant Ortiz and Detective Dease that the car was not locked and the petitioner rode in the back seat of the car by himself during the ride, at normal speeds, from Cheshire to New Haven. During the trip neither detective questioned the petitioner.
Once they arrived at the police department the detectives and the petitioner drove into parking area reserved for police vehicles, entered the building, and ascended by elevator to the detective division on the third floor. The elevator utilized by the petitioner and detectives was neither private nor unavailable to members of the public with business on the building's upper floors. Once on the third floor the petitioner and the detectives went to an interview room . This room had windows. It's door remained open while the petitioner was being interviewed.
Shortly after the petitioner entered the interview room, he was read his Miranda rights. As his rights were being read to him the petitioner indicated verbally that he understood each right. The form was initialled by an officer as each right was read to the petitioner and then signed by the detectives once all the petitioner's rights had been explained to him. The petitioner, however, refused to sign the rights form from which the detective had been reading. cf. Respondent's Exhibit A. The refusal of the petitioner to actually sign the form does not, by itself, suggest that he was not, in fact, advised of his Miranda rights, or that his subsequent statement was taken in violation of any of his rights. cf. State v. Dobson, 221 On.. 128 (1992).
During the subsequent interview the petitioner gave the police a statement. In his statement the petitioner admitted that he stabbed the victim but claimed that she had been in possession of the knife and that his actions were defensive in nature. He also asserted that he had not sexually assaulted the victim. Additionally, during the interview, he intimated that he thought he was being questioned perhaps because he was the only other person in the apartment building at the time. At this point in the interview the detectives had not told the petitioner that the victim had been found with her blouse raised and her pants CT Page 404 partially loosened. Nor had they discussed with the petitioner whether anyone else had been discovered to have been in the apartment building at the time of the homicide.
After the petitioner had made an oral statement, he then gave a taped statement. cf. Respondent's Exhibit C. While he was not read his Miranda rights again before he gave his taped statement, and this statement was given a few hours after he first arrived at police headquarters, none of the petitioner's testimony at the habeas hearing warrants disturbing the finding at trial and on appeal that the petitioner gave his statements voluntarily and knowingly after an effective waiver of his Miranda rights. cf.State v. Burge, 195 Conn. 232 (1985).
Once the petitioner gave his statement, he was placed under arrest.
At the habeas hearing the petitioner claimed that he had been stripped and searched and also placed in a line-up during the course of his interrogation. The detectives who were with him testified credibly that neither event took place. The petitioner also claims that his statement was coerced and that he was, in fact, merely agreeing with assertions made to him by the detectives because they had intimated that his mother might be arrested if he didn't confess. He testified that he was worried for his mother's well-being. The court does not credit these self-serving assertions by the petitioner.
In his statement to the police, the petitioner claimed that the victim had taken a knife from his mother's apartment and that she had attacked him in the basement with the knife. He said that while he was protecting himself from the knife it turned in her hand and she was stabbed. The petitioner also stated that he discarded the knife by hiding it in the garbage on Dixwell Avenue across from the Plaza. While not part of his taped statement, the petitioner also told the police at some point during the evening interrogation after he had given his statement that he had put the knife in a brown paper bag.
On September 10, 1987, Prisilla Damon told the police that a brown handled knife was missing from her kitchen. Petitioner's Exhibit 1, Trial Transcript p. 422. Additionally, at the petitioner's criminal trial, Nathan Collins, a local business maintenance worker, testified that approximately three days after the homicide he ran over a knife while mowing a lawn adjacent to the Elks's Club which is nearby the Dixwell Plaza on Dixwell CT Page 405 Avenue in New Haven. He testified that the knife had a brown handle and appeared to have been in a brown bag which was torn apart by the action of the lawn mower. Mr. Collins discarded the knife pieces in a dumpster before the police learned of this discovery; the knife was never recovered. Id. pp. 615-619.
At the time of his questioning, the petitioner was familiar with police procedure and the criminal justice process. He had prior felony convictions. He had been questioned by the police before. He had also been incarcerated. The petitioner was not on new ground.
The petitioner was arrested and charged with Murder. During the course of the criminal proceedings he was represented by Attorney Mark Rademacher. Mr. Rademacher, who graduated from law school in 1982, was an active criminal defense lawyer at the time of his representation of the petitioner, having been defense counsel in approximately thirty criminal trials before this matter, and handling approximately ten trials a year at the time of this trial.
During the course of his representation of the petitioner, Attorney Rademacher filed a Motion to Suppress to the statement he gave the police during the evening and morning hours of September 9th and 10th of 1987. The Motion was heard by the court immediately before the commencement of the trial.
The petitioner claims that Mr. Rademacher's representation was ineffective in that he did not have the petitioner testify at the suppression hearing. Attorney Rademacher testified at the habeas hearing that he decided not to have the petitioner testify at the suppression hearing because he was concerned that his suppression testimony could later be used by the State to impeach the petitioner if he decided to testify at the trial in chief. Counsel properly assessed the law that if the petitioner had testified at the suppression hearing and then again at trial, inconsistencies in his testimony could have been brought out by the State to impeach his credibility. cf. State v. Vega,163 Conn. 304 (1972).
Connecticut has adopted a two prong test in weighing claims of ineffective assistance of counsel. In order for the petitioner to prevail on this basis he must prove both that his counsel's performance was deficient, and, "that there is a reasonable probability that, but for counsel's unprofessional errors, the CT Page 406 result of the proceedings would have been different." Stricklandv. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674
(1984).
It is clear from the record that the petitioner did not testify at the suppression hearing and that his counsel did not call him as a witness. It is less clear whether the petitioner actually knew he had the right to testify at this pre-trial hearing. Attorney Rademacher did not claim in his testimony that he specifically advised the petitioner of his right to testify. Nor did the petitioner establish by credible evidence at the habeas hearing that he would have testified at the suppression hearing had he known of this right. "Criminal defendants are required to take some affirmative action regarding their right to testify before they can claim that they have been deprived of that right." Rodriguez v. Commissioner, 35 Conn. App. 627 (1994). Assuming, arguendo, that the petitioner had not been advised by counsel of his right to testify at the suppression hearing, he has not proven that he would have, in fact, testified. Finally, based on the court's assessment of the petitioner's credibility at the habeas hearing, the court finds that even if the petitioner had testified at the suppression hearing there is not a reasonable probability that the outcome of the suppression hearing would have been different.
The petitioner's second claim relating to the ineffective assistance of counsel is that he was not advised by counsel of his right to testify at the trial in chief Attorney Rademacher testified that while he does not have a specific recollection of having advised the petitioner of his right to testify at the trial, it was then his normal practice to discuss this right with his criminal clients. He also testified that he usually does not decide what advice to give his clients about testifying until after the State has rested at trial. He believes this is the procedure he utilized in the petitioner's case. While the court can not make a determination as to whether counsel actually advised the petitioner of his right to testify, such analysis is unnecessary. At the conclusion of the State's case, and not in the presence of the jury, the court questioned the petitioner on the record as to whether he intended to, exercise his right to testify. He responded in the negative. The petitioner knew he had the right to testify at trial. Additionally, the petitioner has not established that even if he had given earlier and more thoughtful consideration to his right to testify that he would have, in fact, testified. Finally, the court does not believe CT Page 407 that his testimony, if proffered, offers any probability that the jury result would have been different.
Attorney Rademacher testified that he believed the petitioner should not testify at trial. While he had an understanding with the State's Attorney as to the extent to which the petitioner's prior felony record could be utilized to impeach his credibility, Attorney Rademacher's strategy in the case was to establish that the petitioner had already left the apartment and was en route to work at the time the homicide occurred. It was his belief that he had a better opportunity to advance this theory concerning time of death in order to raise reasonable doubt without having the petitioner testify, and that if the petitioner had testified, the credibility of his reasonable doubt argument might have been destroyed through cross examination of the petitioner. Under the facts of this case the court finds no fault with counsel's trial strategy.
Finally, on the issue of ineffective assistance of counsel, the petitioner claims that Attorney Rademacher failed to adequately investigate his competence to stand trial. Aside from testifying at the habeas hearing that he was under considerable stress at the time of trial as a result of his pre-trial incarceration and the impending trial, the petitioner offered no evidence at the habeas hearing bearing on his competence to stand trial. The court is unpersuaded that even the manifestation of anxiety one may experience who is about to be tried for murder should alert counsel to the need to explore his client's competence. Attorney Rademacher testified credibly that based on his pre-trial conversations with the petitioner, the question of his competence was never an issue. The court finds that the petitioner has failed to meet his burden of proof that his counsel failed to adequately explore his competence to stand trial.
Count Two consists of the petitioner's claims that both the trial and Supreme Court violated his State and Federally protected constitutional rights by not suppressing the statement he gave to the New Haven police. The petitioner moved to suppress the statement at trial. On appeal he argued that the trial court erred in not suppressing his statement. The Supreme Court disagreed. It is not the function of the habeas court to review decisions of the Supreme Court. Additionally, the court has heard no credible evidence from the petitioner at the habeas hearing which would erode the factual underpinnings of either the trial CT Page 408 court's refusal to suppress his statement or the Supreme, Court's affirmation of the trial court's decision.
For the reasons stated, the petition is dismissed.
Bishop, J.